## LOONEY, ATTORNEY GENERAL, ET AL. *v.* EASTERN TEXAS RAILROAD COMPANY ET AL.

### APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TEXAS.

No. 756. Argued April 16, 17, 1918.—Decided May 20, 1918.

In a suit by carriers to restrain the attorney general of a State from instituting suits against them for damages and penalties for complying with an order of the Interstate Commerce Commission respecting rates, the District Court issued a preliminary injunction (not appealed from) pending further proceedings by the Commission and until final hearing by the court. *Held,* that a further order in the case, restraining the defendant from prosecuting a suit of the character complained of which he subsequently began in a state court was in exercise of the power of the District Court to protect its existing jurisdiction and was not appealable under Jud. Code, § 266. Appeal dismissed.

THE case is stated in the opinion.

*Mr. Luther Nickels,* Assistant Attorney General of the State of Texas, with whom *Mr. B. F. Looney,* Attorney General of the State of Texas, was on the briefs, for appellants.

*Mr. J. W. Terry*, with whom *Mr. Hiram Glass* and *Mr. H. M. Garwood* were on the briefs, for appellees.

MR. JUSTICE CLARKE delivered the opinion of the court.

This case presents for decision a motion by appellees to dismiss the appeal for want of jurisdiction, and it involves the consideration of the latest chapter in a litigation which was commenced in 1911, when the Railroad Commission of Louisiana filed with the Interstate Commerce Commission a complaint charging various railroad companies with maintaining unreasonable rates on traffic from Shreveport, Louisiana, to points in Texas, and with maintaining rates which unjustly discriminated in favor of traffic moving wholly within the State of Texas as against that between Louisiana and Texas.

A hearing resulted in an order by the Commission, which was assailed by the railroad companies as invalid, but which this court sustained in *Houston, East & West Texas Ry. Co.* v. *United States*, 234 U. S. 342, in a decision rendered in 1913, which has come to be widely referred to as the *"Shreveport Case."*

After this decision there were further proceedings before the Interstate Commerce Commission, which resulted, on July 7, 1916, in the order out of which this litigation arose, which required many railroad companies, among other things,

"To establish, on or before November 1, 1916,  . . . and thereafter to maintain and apply to the transportation of property between Shreveport, Louisiana, and points in the State of Texas, class rates and rates on the above-named [in the order] commodities not in excess of those contemporaneously applied by them for the transportation of like property for like distances between points in the State of Texas, except in those instances in which the rates between Texas points have been depressed

by reason of water competition along the Gulf of Mexico
or waters contiguous thereto."

Immediately after this order was entered the Attorney
General of Texas declared that it was void and that he
would institute suits under the Texas laws for damages
and penalties against any carrier which should comply
with it. Thereupon the carriers filed a bill in the United
States District Court for the Western District of Texas,
in which they averred the validity of the order, the ne-
cessity for their obeying it, their intention to obey it,
the threat of suits by the Attorney General, and, attach-
ing a copy of the tariff they had compiled to comply with
the order (designated as Texas Lines Tariff 2-B), they
prayed for an injunction restraining the Attorney Gen-
eral from executing the threat which he had made. A
temporary restraining order was granted and on Novem-
ber 1st, 1916, the tariffs were duly filed.

Issue was joined on this bill, and elaborate pleadings
were filed by both parties, such that there can be no
doubt that the Attorney General challenged the validity
of the order as arbitrary, unreasonable, unsupported by
the evidence and void, and especially as being inappli-
cable, in terms and for want of power, to the western
part of Texas, which, for rate-making purposes, is desig-
nated "differential territory."

An application for a temporary injunction, on the
issues thus joined, was heard on April 4, 1917, by three
judges, and resulted in an order as prayed for. The court,
in arriving at its announced conclusion, expressly dis-
claimed passing on the merits of the controversy, and
granted the injunction because, as is variously stated in
the opinions rendered, it deemed it necessary to prevent
a multiplicity of destructive suits against the carriers;
because the order of the Commission could not be held
void on a preliminary hearing; and because the Texas
rate situation involved was at the time in process of re-

examination by the Interstate Commerce Commission. No appeal was taken from this order.

Between the time of the filing of the bill for the injunction and the hearing on April 4th, the Interstate Commerce Commission had entered two orders in the proceeding in which the order of July 7th, 1916, had been granted, one that the tariff filed by the carriers on November 1st, Texas Lines Tariff 2-B, slightly modified, should be permitted to remain effective until further order; and another re-opening the proceeding to give to the Texas authorities an opportunity to introduce new and material evidence, which they asserted should lead to a modification or vacating of the order and might bring about a just and reasonable settlement of the controversy.

Immediately after the granting of the preliminary injunction the taking of testimony in the re-opened inquiry was commenced by the Interstate Commerce Commission, the Attorney General participating, and went forward until in May, when it was continued to the following October for the filing of briefs and for oral argument.

And now, notwithstanding the temporary injunction and notwithstanding the pendency of the re-opened hearing before the Interstate Commerce Commission, the Attorney General on July 20th, instituted suit in a Texas state court, in which he prayed for an injunction restraining the carriers from giving the effect which they had been giving to the Texas Lines Tariff, 2-B, since November 1st of the preceding year, as applied to intrastate traffic moving less than 351 miles within, to and from "differential territory." in Texas. Before the date set for this application by the Attorney General for an injunction, the carriers filed a second supplemental bill in their suit in the United States court, detailing the facts with respect to the various proceedings and hearings which had been had therein, and with respect to the

injunction, not appealed from, granted in the preceding April, and prayed that the Attorney General be enjoined from prosecuting the suit commenced by him in the state court or any other suit of like character, for the reason, among others, that "It is necessary to protect the juris-diction of this court already acquired over the subject matter, and in order to afford these plaintiffs [the carriers] full and complete relief."

The Attorney General answered this bill, denying that the rates complained of in the state court were warranted by the order of July 7th, 1916, or by the proper con-struction of the Texas Lines Tariff 2-B, and then went forward and again assailed the validity of the order of July 7th, 1916, on substantially the same grounds stated in answers filed by him in the case prior to the granting of the injunction in the preceding April, and he prayed that the order be declared to be null and void, in whole or in part.

On this supplemental bill an injunction was granted, to continue until final hearing or until further order of the court, enjoining the Attorney General and his assist-ants from prosecuting the suit thus commenced by him in the Texas court, and from instituting or prosecuting any similar suits in any court other than the United States District Court for the Western District of Texas and from in any way interfering with the carriers in charging the rates published in Texas Lines Tariff 2-B and supplements thereto.

From this temporary injunction the Attorney General appeals to this court, and the case has been heard on the motion of the appellees to dismiss the appeal for want of jurisdiction. One ground, among others, urged for sus-taining this motion is that the Federal District Court having acquired, and having entered upon the exercise of jurisdiction over the parties to and the subject-matter of the suit in that court, prior to the commencement of

the suit in the state court, the injunction issued against the Attorney General was granted in aid of and was nec-essary to protect that jurisdiction until a conclusion should be reached completely disposing of the case and con-troversy, and is therefore not an appealable order within § 266 of the Judicial Code.

The theory upon which the Attorney General seeks to sustain his appeal is, that the injunction of September 22nd is one restraining him in his capacity as a state of-ficer from enforcing statutes of the State of Texas and orders by the Railroad Commission of that State entered pursuant thereto, on the ground that the statutes are unconstitutional and that the orders are unlawful, and therefore, it is claimed, an appeal direct to this court is warranted under § 266 of the Judicial Code.

With this contention of the Attorney General we can-not agree. There is no claim in the second supplemental bill, on which this injunction was granted, that any state statute is unconstitutional or that the execution of any order of the Railroad Commission of Texas should be suspended because invalid. The bill is very voluminous, but as we interpret its allegations it simply sets out in de-tail the history of the suit in which it was filed, for the purpose of showing: that by the pleadings of the parties,— by those of the carriers not more than by those of the Attorney General,—every phase of the controversy, and definitely the aspect of it involved in the petition filed in the state court by the Attorney General on July 20, 1917, had been submitted to and was considered by the court when the application for a temporary injunction was heard in the preceding April, and also what the facts were with respect to the re-opened inquiry before the In-terstate Commerce Commission, so that it should appear to the court that the Texas rate situation, again involving the phase of it presented by the Attorney General in the state suit, was pending, undisposed of before the Commis-

sion when his petition was filed.  The specific ground of
the prayer for the injunction is, "Because the state court
is without jurisdiction of the subject matter and because
it is necessary to protect the jurisdiction of this court
already acquired over the subject matter, and in order to
afford these plaintiffs full and complete relief, contem-
plated and intended by the opinions of such Circuit
Judges and order made by them granting the injunction
herein."

The opinion of the court in granting the injunction
appealed from is a satisfactory and sufficient statement
of what this record discloses had been done in the case
prior to the application for the injunction and amply jus-
tifies the granting of it.  This statement is as follows:

"The subject-matter of the State suit is a part of that
involved in this case.  The jurisdiction of this Court with
reference thereto has been invoked by the parties plain-
tiff and defendant and by interveners; the jurisdiction
has been exercised by this Court in granting an injunction
at the prayer of plaintiffs, and refusing one asked by de-
fendants, and by considering and determining an appli-
cation for a continuance, . . . Jurisdiction having
been conferred by law, having been invoked by all the
parties, and having been exercised by the Court, its
protection is a right and duty not limited by § 266, Ju-
dicial Code.  The injunction prayed for by complainants
is granted. . . .

". . . But, waiving all questions as to the legality or
propriety of modifying their action [that of the Judges in
April preceding], our conclusion is that the present status
should be maintained until such time as this Court may
consider all of the grave questions of law and all the
great mass of facts connected with this complicated and
important litigation.  The fact that the matters involved
are again before the Interstate Commerce Commission,
and that their action may affect the rates attacked, fur-

nishes an additional reason for our conclusion. The relief asked by the defendants is refused."

The use of the writ of injunction, by federal courts first acquiring jurisdiction over the parties or the subject-matter of a suit, for the purpose of protecting and preserving that jurisdiction until the object of the suit is accomplished and complete justice done between the parties, is familiar and long established practice, *Freeman* v. *Howe,* 24 How. 450; *Harkrader* v. *Wadley,* 172 U. S. 148, 163, 164; in a rate case, *Missouri* v. *Chicago, Burlington & Quincy R. R. Co.,* 241 U. S. 533, 543. So important is it that unseemly conflict of authority between state and federal courts should be avoided by maintaining the jurisdiction of each free from the encroachments of the other, that § 265 of the Judicial Code, Rev. Stats., § 720, Act of March 2, 1793, c. 22, 1 Stat. 334, has repeatedly been held not applicable to such an injunction. *Julian* v. *Central Trust Co.,* 193 U. S. 93, 113; *Simon* v. *Southern Ry. Co.,* 236 U. S. 115.

The motion to dismiss is granted.

*Dismissed.*